DECISION ON OBJECTION TO THE MAGISTRATE'S DECISION
{¶ 1} Relator, Cast Specialties, Inc., has filed an original action requesting this court to issue a writ of mandamus ordering respondent, Industrial Commission of Ohio ("commission"), to vacate its award to respondent-claimant, Victor Lumaban ("claimant"), for relator's alleged violation of a specific safety requirement ("VSSR").
 {¶ 2} This court referred the matter to a magistrate, pursuant to Civ.R. 53(C) and Section (M), Loc.R. 12 of the Tenth District Court of Appeals. The magistrate rendered a decision, which included findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate decided that the requested writ of mandamus should be denied. Relator has filed an objection to the magistrate's decision, asserting:
The magistrate's decision penalizes an employer by finding a violation of an administrative code section that requires that an employer shield an employee from accidental contact with the danger zone when clearly the employee's contact with the danger zone was in no way accidental.
 {¶ 3} Relator specifically objects to the magistrate's finding that relator violated Ohio Adm. Code 4121:1-5-11(D)(6), which requires danger zones in die casting machines to be guarded. Relator argues that it was only required to guard employees from "accidental" contact, and, because claimant's contact was intentional, the magistrate erroneously concluded that relator violated the code. Relator asserts it did all the code required because a safety door and dual operating buttons on the machine provided guarding, and because relator provided a special "golf club" tool for employees to use when freeing a stuck die plunger and instructed employees to obtain assistance from another employee when releasing the plunger. Relator asserts further that claimant's use of a glove to defeat the safety device on the machine, combined with his failure to follow relator's instructions, did not result in "accidental" contact with the dangerous parts of the machine, but were intentional acts that relator could not have prevented. As argued by relator: "This decision by the Magistrate completely rewrites the Administrative Code at [former] 4121:1-5-01(B)(70) in that this decision means that guarding means that an employer must have a device that prevents intentional contact with the danger zone."
 {¶ 4} The commission's memorandum in opposition to relator's objection points out that, in this case, the fact that the plunger stuck frequently enough to warrant the fabrication of a special tool to free the mechanism indicated that releasing a stuck plunger was an integral part of the machine's normal operation. Thus, the commission maintains that claimant's intentional act of placing his hand inside the danger zone of the machine did not defeat his claim because his injury occurred as a result of the danger zone being unguarded.
 {¶ 5} For the reasons below, we agree with relator that the commission's order is an abuse of discretion, and we sustain relator's objection.
 {¶ 6} On March 20, 2001, claimant was operating a die casting machine at a foundry operated by relator. When the machine operated normally, a plunger pushed hot metal into a mold. One of claimant's duties as the machine's operator was to release the plunger when it failed to retract. While manually retracting the plunger on this date, the moving dies crushed claimant's left arm.
 {¶ 7} On March 25, 2002, claimant filed a VSSR application, which prompted a commission investigation of the accident. On March 19, 2003, a staff hearing officer ("SHO") heard the VSSR application, recording and transcribing the hearing for the record.
 {¶ 8} At the hearing, Michael Lucak, president of Cast Specialties, Inc., described the operating cycle of the machine:
* * * The way the machine operates, after it's turned on, the operator closes the safety door, which in turn activates the switch. That activates a safety switch on top, which lets the machine close. When the machine is closed, a green light comes on, tells you it's locked up. At that point, you can take a ladle of metal, pour it into what's called a shot sleeve. You push a button manually, that shot cylinder injects the hot metal into the mold. There is a timing mechanism, and the electronics in the machine, after a certain amount of seconds, which is called dwell time in die casting language, the machine will open automatically.
As it opens, when it's completely opened, the safety door is opened, the operator reaches in, takes out the casting and repeats the cycle.
(Joint Stipulation of Evidence at 58-59.)[1]
 {¶ 9} Mr. Lucak also described the operation of the plunger:
* * * It's the plunger on the end of the hydraulic shaft that drives the hot metal up into the mold, correct.
(Stip. Evid. at 61.)
 {¶ 10} At the hearing, Gary Curren testified as an expert witness on behalf of relator. On March 22, 2001, two days after the accident, Curren visited the foundry at relator's request. Curren examined the machine that had injured claimant. Curren testified:
[Relator's Counsel]: What safety devices are on that machine to protect a worker from accidental contact with the point of impact?
[Curren]: It actually had a two-stage type safety device. It had a gate guard or barrier guard, and coupled with that was an interlock system, which is an electrical device that disengages power or energy to the machine, unless the criteria is [sic] met, meaning that the gate guard is in the closed position.
[Relator's Counsel]: Okay. And based on your experience, is that sufficient guarding for such a machine?
[Curren]: Well, when you look at the Ohio Administrative Code and the specific standards covering die cast machines, they're found specifically in 4121:1-5-11, and in there it says die cast machines, the danger zone shall be guarded.
Yes, it did more than meet the criteria with the interlock and the barrier gate guard.
[Relator's Counsel]: There's been some testimony regarding photograph No. 14 of the machine. And Mr. Lumaban testified that he stuck his glove into the switch, which is photographed in No. 14. Is that the interlock device you were referring to?
[Curren]: Yes, it looks like a cam action with a roller on it, with a conduit with wires going into it.
Yes, I would say it is, yes.
[Relator's Counsel]: It was Mr. Lucak's testimony that by sticking your glove in that limiting switch the machine actually believes that the door has been shut?
[Curren]: That would be one way to fool it, yes.
* * *
[Relator's Counsel]: Let me draw your attention to Section 4121:1-5-11(d)(6). I believe that's the section that applies to die cast machines?
[Curren]: Specifically, yes.
[Relator's Counsel]: And do you have an opinion as to whether or not this machine met that safety requirement?
[Curren]: Yes, it definitely met this requirement.
[Relator's Counsel]: How is it that it met this requirement?
[Curren]: The standard, specifically, says the danger zone of a die casting machine shall be guarded, and it was guarded via a barrier or gate guard, and also in addition with an interlocking system on the gate guard.
(Stip. Evid. at 110-112.)
 {¶ 11} Claimant also testified at the hearing, at times with the aid of an interpreter. The following exchange occurred:
HEARING OFFICER: In order to get the plunger to retract, you put this golf club tool in there, bracing it against one die half, and the other into this hole where the plunger is stuck, you then start jogging the one die half and then it forces it to free?
[Lumaban]: Yes.
* * *
HEARING OFFICER: When you say you use this bypass switch, you did that so that you could move this die?
[Lumaban]: Yes.
* * *
HEARING OFFICER: In order to use this golf club tool to free the stuck plunger, is it necessary to move this die, cause it to close somewhere, either side, but it's in order to perform what you're stating that you have to move this die —
[Lumaban]: Yes.
HEARING OFFICER: — closed in this fashion?
[Lumaban's Counsel]: That's why you hit the bypass button?
[Lumaban]: Yes.
* * *
HEARING OFFICER: Right, but why is he using a bypass button? What is the purpose of that?
INTERPRETER: What's the purpose?
[Lumaban's Counsel]: Why did he use the bypass button?
[Interpreter]: To move the die.
[Lumaban's Counsel]: To move the die.
(Stip. Evid. at 77-79.)
 {¶ 12} During claimant's cross-examination by relator's counsel, the following exchange occurred:
[Relator's Counsel]: Now, on the night of your accident, Mr. Lumaban, the golf club was at machine No. 9?
[Lumaban]: Yes, sir.
[Relator's Counsel]: And machine No. 9 is about 50 feet away from where you were?
[Lumaban]: Yes, sir.
[Relator's Counsel]: And you chose not to go get the golf club because it was 50 feet away?
[Interpreter]: Instead of getting it back, if he gets it back the person who borrowed the golf club they might borrow it again. Instead, he chose to take that metal and use that.
[Relator's Counsel]: But that was your choice, wasn't it, Mr. Lumaban?
[Lumaban]: Yeah.
[Relator's Counsel]: And you stuck your glove in the switch, didn't you?
[Lumaban]: Yes, sir.
[Relator's Counsel]: And you stuck your glove in the switch so the switch wouldn't work, isn't that correct?
[Lumaban]: To turn on the switch.
[Relator's Counsel]: You stuck your glove in the switch, didn't you?
[Lumaban]: Yes.
(Stip. Evid. at 84-85.)
 {¶ 13} After cross-examination by relator's counsel, the following exchange occurred on re-direct examination:
[Lumaban's Counsel]: Why did you put your glove there?
[Lumaban]: To able [sic] to retract the die. To move you had to press the other switch.
[Lumaban's Counsel]: You had to put the glove here, operate a switch, and the plunger would move?
[Lumaban]: Right.
[Lumaban's Counsel]: The die would move?
[Lumaban]: Yeah, able to move, yeah.
* * *
[Lumaban's Counsel]: If you put your glove in there, does it stop the door from closing?
[Lumaban]: If you put the glove in here, you're able to move the die. We use the other switch to move the die when you do this.
[Lumaban's Counsel]: One more time. This is the door to the die?
[Lumaban]: Yes, ma'am.
[Lumaban's Counsel]: Right. There's a switch, there's also this area. If you put the glove in here, you hit the switch, then the die will move?
[Lumaban]: Yeah.
[Lumaban's Counsel]: If you don't put your glove in here and you hit the switch, what would happen?
[Lumaban]: Nothing.
(Stip. Evid. at 86-88.)
 {¶ 14} On re-cross examination by relator's counsel, the following exchange occurred:
[Relator's Counsel]: Mr. Lumaban, in other words, that switch there it's called a limit switch, that switch is there to protect workers from accidental contact with moving dies, isn't this right?
[Lumaban]: Yeah.
[Relator's Counsel]: You stuck your glove to eliminate that safety device?
[Lumaban]: Yeah. Yes, sir.
(Stip. Evid. at 88.)
 {¶ 15} Following the hearing, the SHO issued an order granting the VSSR application. The SHO found, first, that Ohio Adm. Code 4121:1-5-11(D)(6) is applicable to the machine and situation in question. The SHO stated:
* * * This Code section refers to "Die casting machines" and specifically states "(d)anger zones on die casting machines shall be guarded." O.A.C. 4121:1-5-01(B)(34) defines a "danger zone" as "the point of operation where a known hazard exists." O.A.C. 4121:1-5-01(B)(70) defines "guarded" as "covered, fenced, railed, enclosed, or otherwise shielded from accident contact." Webster's Dictionary defines "shield" as "a guard or safety screen, as over the moving parts of machinery". O.A.C. 4121:1-5-01(B)(97) defines "point of operation" as "the area where material is actually positioned and work is being performed during any process."
(Stip. Evid. at 125.)
 {¶ 16} As to the sequence of events leading up to the injury, the SHO found:
In the present case, [Lumaban] sustained a severe injury to his left upper extremity (crush and amputation injury to left forearm and hand) when his left arm was caught between two closing die halves. [Lumaban] was attempting to dislodge an injection plunger that had become stuck while forcing molten metal into the closed die halves. While not a frequent occurrence, testimony at hearing indicated that the plunger stuck frequently enough to lead the employer to devise a tool called the "golf club" for use in freeing the plunger * * *. The die-casting machine would not be capable of delivering an injection of molten metal into the closed dies until and unless the injection plunger had retracted.
* * *
Testimony from [Lumaban] showed that, after realizing that the injection plunger was stuck, [Lumaban] attempted to free or dislodge it by placing a short metal bar against one die half and, while slowly causing the dies to close, guided the other end of the metal bar so that it would be in alignment with the end of the stuck injection plunger * * *. As the dies continued to close, [Lumaban] attempted to use the force of closure on the metal bar to drive the plunger backwards into its cavity and thereby cause it to retract into its proper position. Tragically, the dies closed onto [Lumaban's] left arm and caused the resulting injury.
When asked why he did not follow the employer's procedure for freeing a stuck plunger (i.e., use of the "golf club" tool (BWC investigation photo no. 11) and obtain the assistance of a co-worker), [Lumaban] stated that a "golf club" tool was not available for his machine and that no co-worker was available to assist him * * *. The employer countered that there were one or more "golf club" tools available for use with the casting machines, that [Lumaban] had been instructed to use the "golf club" tool to free stuck plungers and that [Lumaban] had also been told to obtain the assistance of a co-worker in such a situation and not to attempt to free the plunger by himself * * *.
(Stip. Evid. at 125-126.)
 {¶ 17} As to the machine's safety devices, the SHO found:
Testimony at hearing revealed that the die casting machine in question (number 8 machine) was equipped with several safety mechanisms at the time of [Lumaban's] injury * * *. Between the operator's position adjacent to the machine and the "danger zone," wherein the die halves were located and would close together, there was a sliding steel door. This door was equipped with a switch that would prevent movement of the die halves unless the safety door was closed * * *. The machine was also equipped with dual palm buttons, both of which had to be pressed in order to initiate the machine's casting cycle. * * *
(Stip. Evid. at 126.)
 {¶ 18} Given these safety devices, the SHO found that "during the casting cycle of the machine, the `danger zone' (i.e., die location and area of movement) was adequately and properly guarded so as to prevent accidental contact with the dies while a casting was being made. The testimony of Mr. Curren was found persuasive on this point." Id. The SHO found further, however, that "the inquiry does not stop with a review of only the casting operation." Id. Rather:
* * * Testimony from the parties confirmed that freeing the injection plunger when it would stick was also part of the operation of the machine and was one of [Lumaban's] responsibilities. Because the plungers of the various diecasting machines stuck frequently enough to warrant the fabrication of "golf club" tools, the Staff Hearing Officer finds that this process (freeing a stuck plunger) must be considered as an integral part of the machines' usual mode of operation. The metal door with an interlock switch and the dual palm buttons would not be useful in safeguarding the process of freeing a stuck injection plunger. Therefore, the fact that [Lumaban] wedged his glove into a metal door's interlock switch mechanism, to override its function of preventing access to the dies, would not be dispositive. Access to the dies was required in order to free a stuck plunger.
(Stip. Evid. at 126.)
 {¶ 19} According to the SHO, the critical question, therefore, "is the effect of claimant's purposeful, albeit negligent, placement of his left arm in the `danger zone' (between the die halves), during his attempt to free the stuck plunger, on the employer's duty to guard the machine against `accidental' contact with the dies." Id. As to this question, relator contended that claimant's failure to obtain the assistance of a co-worker and failure to use the golf club tool in order to free the plunger constitutes unilateral negligence as would bar a finding that the employer violated a specific safety requirement. In response, claimant asserted that the simple fact the dies injured him is proof that they were not guarded in a proper or effective manner.
 {¶ 20} As to relator's claim of unilateral negligence by claimant, the SHO noted:
* * * [T]he issue of unilateral negligence does not properly arise unless it is shown that the employer was, initially, in compliance with applicable safety requirements. The purpose of the specific safety requirements is to prevent injury to workers and to protect them from their own acts of negligence, stupidity and folly. The question of unilateral negligence arises only where it can be shown that the worker unilaterally acted to disable, avoid or otherwise circumvent a proper safety device. The question in the instant claim becomes, therefore, one of whether or not the "danger zone" on the die casting machine was properly guarded and whether the employer's provision of the "golf club" tool qualifies as a proper means of "guarding" the danger zones of the die-casting machine during procedures to free a stuck plunger. If so, then [Lumaban's] unilateral act of purposefully avoiding or failing to use the "golf club" tool was the reason that his left arm was able to enter the "danger zone" of the machine and was also the reason for his subsequent injury.
The Staff Hearing Officer finds that the "danger zone" of the die-casting machine in question was not properly guarded and that the employer, therefore, violated the mandate of O.A.C. 4121[:]1-5-11(D)(6). This violation of a specific safety requirement was the direct and proximate cause of [Lumaban's] injury. As previously stated, "guarded" requires a manner of shielding or prevention against accidental contact with the "danger zone" (i.e., dies). "Accidental contact" must be construed as meaning the contact which results or has the potential to result in injury. As such, the danger zone herein should have been guarded so as to prevent the dies from closing onto, and thereby injuring, [Lumaban]. There is no evidence that establishes that it was necessary to completely close the dies in order to free a stuck plunger. The fact that the dies did so close, sufficient to crush [Lumaban's] arm, is proof that "accidental contact" was not effectively guarded against. [Lumaban's] failure to use a "golf club" tool is not a bar, as the "danger zone" has been found to have been inadequately guarded. [Lumaban's] negligence, stupidity or folly is what the required safety mechanisms were to guard against. Additionally, the Staff Hearing Officer does not find that the applicable Code section permits the employer to substitute a tool of some sort for the guarding specified therein (O.A.C. 4121:1-5-11(D)(6)). The Staff Hearing Officer finds that the rationale of [State exrel. Scott Fetzer Co., Halex Div. v. Indus. Comm. (1998),81 Ohio St.3d 462] is applicable in that it was held that the use of a mechanism (there, a robotic device — here, a "golf club" tool) did not eliminate the need for guarding of the "danger zone" of the die casting machine against "accidental contact."
(Stip. Evid. at 127.)
 {¶ 21} On these grounds, the SHO granted an additional award of compensation to claimant in the amount of 25 percent of the maximum weekly rate.
 {¶ 22} Relator, after being denied a rehearing, filed this mandamus action.
 {¶ 23} In order for this court to issue a writ of mandamus as a remedy from a determination of the commission, relator must show a clear legal right to the relief sought and that the commission has a clear legal duty to provide such relief. Stateex rel. Pressley v. Indus. Comm. (1967), 11 Ohio St.2d 141. A clear legal right to a writ of mandamus exists where the relator shows that the commission abused its discretion by entering an order that is not supported by any evidence in the record. Stateex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. On the other hand, where the record contains "some evidence" to support the commission's findings, there has been no abuse of discretion and mandamus is not appropriate. State ex rel. Lewis v. DiamondFoundry Co. (1987), 29 Ohio St.3d 56.
 {¶ 24} In order to establish a VSSR award, an employee must prove: (1) there exists an applicable and specific safety requirement in effect at the time of the injury; (2) he employer failed to comply with the requirements; and (3) failure to comply was the cause of the injury. State ex rel. Supreme Bumpers, Inc.v. Indus. Comm., 98 Ohio St.3d 134, 2002-Ohio-7089, at ¶ 46, citing State ex rel. Ohio Mushroom Co. v. Indus. Comm. (1989),47 Ohio St.3d 59, and State ex rel. Haines v. Indus. Comm.
(1972), 29 Ohio St.2d 15.
 {¶ 25} As to the first required element, former Ohio Adm. Code4121:1-5-11(D)(6)[2] provided: "Die casting machines: Danger zones on die casting machines shall be guarded." Former Ohio Adm. Code 4121:1-5-01(B)(34) defined "danger zone" as "the point of operation where a known hazard exists." Former Ohio Adm. Code 4121:1-5-01(B)(70) also provided: "`Guarded': means that the object is covered, fenced, railed, enclosed, or otherwise shielded from accidental contact."
 {¶ 26} The magistrate found that Ohio Adm. Code4121:1-5-11(D)(6) applied to the machine and situation at issue here, and relator does not dispute the applicability of this requirement. Therefore, respondents have met the first element of the test: there was an applicable and specific safety requirement in effect at the time of the injury, Ohio Adm. Code4121:1-5-11(D)(6).
 {¶ 27} As to the second element, the magistrate found that relator failed to comply with the applicable requirement. The magistrate found, first, that the danger zone was adequately guarded during the casting cycle. The magistrate found further, however, that relator failed to guard the danger zone adequately and properly during procedures to free a stuck plunger.
 {¶ 28} Relator objects to the magistrate's finding of non-compliance. As noted above, relator essentially argues that the guarding requirement applies only to guarding that prevents accidental contact with the danger area, not intentional contact such as claimant's.
 {¶ 29} We agree with relator that a VSSR is an employer penalty and, therefore, that we must strictly construe a specific safety requirement in the employer's favor. State ex rel. Burtonv. Indus. Comm. (1989), 46 Ohio St.3d 170. We are also mindful, however, that this strict construction rule "does not apply in resolving factual disputes. It is a rule of statutory, not evidentiary, interpretation, devised only as a guide to interpreting the specific requirements of a safety standard in VSSR claims." Supreme Bumpers, Inc., at ¶ 70. The rule "permits neither the commission nor a reviewing court to construe theevidence of a VSSR strictly in the employer's favor." (Emphasis sic.) Id. at ¶ 71.
 {¶ 30} Before the SHO, claimant "assert[ed] that the simple fact that he was injured by the dies is proof that they were not guarded in a proper or effective manner." (Stip. Evid. at 126-127.) The SHO found:
* * * There is no evidence that establishes that it was necessary to completely close the dies in order to free a stuck plunger. The fact that the dies did so close, sufficient to crush claimant's arm, is proof that "accidental contact" was not effectively guarded against. Claimant's failure to use a "golf club" tool is not a bar, as the "danger zone" has been found to have been inadequately guarded. * * *
(Stip. Evid. at 127.)
 {¶ 31} Relator counters that mere evidence of an injury is insufficient to show a violation, citing State ex rel. Garza v.Indus. Comm. (2002), 94 Ohio St.3d 397. Instead, relator contends that it provided guarding in two ways: (1) the machine's interlock device, which prevented the dies from closing without the door first shutting to prevent accidental contact; and (2) relator's instruction to employees to release a stuck plunger by using the golf club tool and with the aid of another employee who would control the closing of the dies. Had claimant's intentional act not intervened, relator argues, that guarding would have been adequate to prevent injury.
 {¶ 32} Most importantly, as to this and the third element, relator raises the defense of claimant's "unilateral negligence," that is, claimant's intentional actions caused the injury. We agree.
 {¶ 33} The concept of unilateral negligence arises fromState ex rel. Frank Brown Sons, Inc. v. Indus. Comm. (1988),37 Ohio St.3d 162, in which an employer avoided VSSR liability because an employee had removed a part of a scaffold that a safety rule required. Brown held that: (1) employers can be subject to VSSR penalties for only those acts within the employer's control; and (2) a specific safety requirement does not impose a duty of constant surveillance just by requiring a securely and rigidly based scaffold.
 {¶ 34} As to the limits of this defense, the Ohio Supreme Court has repeatedly pointed out:
* * * [T]he defense is not actually about an employee'snegligence. The employer instead avoids VSSR liability when "[the] employee unilaterally violates a safety requirement * * *," * * * that is, when the employee removes or ignores equipment or instruction that complies with a specific safety requirement. * * * On the other hand, an employee's negligence in failing to protect himself from injury due to an employer's VSSR will never bar recovery because specific safety requirements exist to promote a safe work environment and "to protect employees against their own negligence and folly." * * * Thus, the critical issue in a VSSR claim is always whether theemployer complied with the specific safety requirement. * * *
(Emphasis sic.) State ex rel. Quality Tower Serv., Inc. v.Indus. Comm. (2000), 88 Ohio St.3d 190, 193.
 {¶ 35} Here, claimant's own testimony established that he put his glove in the interlock device to defeat the safety device that would have prevented the dies from closing on his arm:
[Relator's Counsel]: Mr. Lumaban, in other words, that switch there it's called a limit switch, that switch is there to protect workers from accidental contact with moving dies, isn't this right?
[Lumaban]: Yeah.
[Relator's Counsel]: You stuck your glove to eliminate that safety device?
[Lumaban]: Yeah. Yes, sir.
(Stip. Evid. at 88.)
 {¶ 36} Thus, regardless of whether relator met the guarding requirements, claimant's own actions defeated those safety measures. It was that action — his deliberate decision to bypass the safety switch — that caused the injury, and no amount of guarding (whether he used the golf club tool or not) could have prevented it.
 {¶ 37} The SHO and the magistrate found that relator failed to meet the guarding requirement because relator's own procedures for releasing the plunger required access to the dies; indeed, the evidence showed that those procedures even allowed a second employee to defeat the interlock switch in order to partially close the dies. In a different case, that may be relevant evidence that an employer's failure to provide adequate guarding caused an injury. The evidence in this case, however, shows that it was not the access to the dies or the acts of another employee that caused the injury. Here, it was claimant's bypass of the safety switch with his glove that caused the dies to close completely and the injury to occur. Therefore, the commission abused its discretion when it imposed a VSSR penalty against relator.
 {¶ 38} Our finding in this regard is consistent with prior decisions of the Ohio Supreme Court. In Quality Tower Service,
the court refused to impose VSSR liability where an employee took action contrary to the employer's instructions and that action caused the employee's death. The court found that the employer "did everything that could reasonably be expected" to comply with applicable safety requirements. Id. at 194. The employer "provided sufficient equipment and directly ordered [the decedent] to use it. [The employer] did not have to rig the gin pole himself or check [the employee's] work to make sure that [the employee] had followed his instructions." Id. The court also cited to its prior consistent decisions: State ex rel. NorthernPetrochemical Co., Nortech Div. v. Indus. Comm. (1991),61 Ohio St.3d 453 (no VSSR penalty where employees had been trained and given appropriate warnings, and the accident resulted purely from employee carelessness in failing to inspect adequately); Stateex rel. Mayle v. Indus. Comm. (1999), 86 Ohio St.3d 74 (no VSSR liability where employer complied with a specific safety requirement by supplying safety belts for the employee's use and employee chose not to wear them). Accord State ex rel. Bishop v.Waterbeds `N' Stuff, Inc. (2002), 94 Ohio St.3d 105 (no VSSR liability where there existed no evidence that additional guarding would have prevented accident).
 {¶ 39} Our finding is also consistent with prior decisions from this court. In State ex rel. Kale v. Indus. Comm. (May 3, 1984), Franklin App. No. 83AP-968, this court held that an employer met a specific safety requirement by making goggles available to employees, even though the injured employee failed to use them. Similarly, in State ex rel. Lewis v. Indus. Comm.
(Mar. 15, 1984), Franklin App. No. 83AP-756, this court refused to impose VSSR liability where the claimant personally disabled a safety device that otherwise complied with the applicable regulations.
 {¶ 40} In contrast to these holdings, the SHO relied upon a case presenting a familiar fact pattern, State ex rel. ScottFetzer Co., Halex Div. v. Indus. Comm. (1998),81 Ohio St.3d 462, where an employee suffered injury while removing a stuck part from a die cast machine. The court found a violation of the guarding requirement and imposed a VSSR on the employer. In our view, the Scott Fetzer decision is distinguishable and not controlling.
 {¶ 41} Unlike here, the record in Scott Fetzer included evidence that the machine had been extensively modified to accommodate a robotic device that retrieved newly formed parts after the dies separated. Those modifications included the removal of the machine's interlocking safety guards, which had been in place to prevent the dies from unintentionally closing. When a part became stuck, the employee turned off the machine and removed the part. In contrast to this case, there was no evidence that the employee had failed to follow the employer's operating instructions or that the employee had disengaged a safety device. In fact, there was no evidence to explain how the accident happened — a far cry from this case, where the evidence established not only that the safety devices were operable, but also that the dies closed because claimant turned off those devices.
 {¶ 42} Respondents also offer, and the magistrate relied upon, State ex rel. Cincinnati Drum Serv., Inc. v. Indus. Comm.
(1990), 52 Ohio St.3d 135. In Cincinnati Drum, the employer argued that the employee had intentionally placed his hand on a moving belt, causing his own injury. The court disagreed, explaining:
Although [the employee's] contact with the belt was intentional, he did not intend to be injured as a result of the contact. If we would accept appellant's argument, we would come to an unjust and illogical conclusion that [the employee], while performing his regular assigned duties, did not accidentally injure himself but, in fact, intended to cause injury to his person. * * *
Id. at 138.
 {¶ 43} To be sure, claimant did not intend to injure himself. He did, however, intend to turn off the safety device. InCincinnati Drum, the court was able to conclude that, if the employer had installed adequate guards, the employee would not have been injured because he would not have been able to place his hand on the moving belt. We cannot make such a finding in this case. Here, any additional safety devices that would have been installed would have been equally inadequate to prevent the injury because, contrary to relator's instructions, claimant unilaterally turned off the safety devices by inserting his glove into the switch. This case, therefore, presents facts more like those at issue in Brown and its progeny, where the employee deliberately disabled or ignored a safety requirement, thus removing VSSR liability from the employer.
 {¶ 44} On these grounds, we sustain relator's objection to the magistrate's decision, and find that the commission abused its discretion in this matter. Consequently, we need not reach relator's additional argument, suggesting relator is immune from liability as a result of a "first time failure" of a safety device.
 {¶ 45} For the foregoing reasons, based upon a review of the magistrate's decision and an independent review of the evidence, this court adopts the magistrate's findings of fact, but rejects the magistrate's conclusions of law. We sustain relator's objection to the magistrate's decision, and this court grants a writ of mandamus to order respondent, Industrial Commission of Ohio, to vacate its decision that found relator had violated a specific safety requirement, and to issue a new order that denies claimant a VSSR award.
Objection sustained, writ of mandamus granted.
Lazarus and Sadler, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State ex rel. Cast Specialties, Inc.,: Relator, : v. : No. 03AP-1084 Industrial Commission of Ohio and : (REGULAR CALENDAR) Victor Lumaban, : Respondents. :
 MAGISTRATE'S DECISION Rendered on July 30, 2004 Gibson Robbins-Penniman, and J. Miles Gibson, for relator.
Jim Petro, Attorney General, and Keith D. Blosser, for respondent Industrial Commission of Ohio.
Garson Associates, Co. L.P.A., and Grace A. Szubski, for respondent Victor Lumaban.
 IN MANDAMUS {¶ 46} In this original action, relator, Cast Specialties, Inc., requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its award to respondent Victor Lumaban for relator's violation of a specific safety requirement ("VSSR").
Findings of Fact:
 {¶ 47} 1. On March 20, 2001, Victor Lumaban ("claimant") was trying to retract the plunger of a die casting machine at a foundry operated by relator. Plunger retraction was one of claimant's duties as the machine's operator. During the plunger retraction procedure, claimant's left arm was crushed by the moving dies. The industrial claim is allowed for: "amputation left proximal forearm," and is assigned claim number 01-810470.
 {¶ 48} 2. During the plunger retraction procedure leading to his industrial injury, claimant was not using a "golf club" tool that had been fabricated for that procedure by relator to keep the machine operator's upper extremities from entering the danger zone. Instead, claimant was using a metal rod approximately 12 inches in length that he had found.
 {¶ 49} 3. On March 25, 2002, claimant filed a VSSR application which prompted a commission investigation of the accident. The commission investigation report is dated July 22, 2002.
 {¶ 50} 4. On March 19, 2003, the VSSR application was heard by a staff hearing officer ("SHO"). The hearing was recorded and transcribed for the record.
 {¶ 51} 5. At the hearing, Michael Lucak, President of Cast Specialties, Inc., described the operating cycle of the machine:
* * * The way the machine operates, after it's turned on, the operator closes the safety door, which in turn activates the switch. That activates a safety switch on top, which lets the machine close. When the machine is closed, a green light comes on, tells you it's locked up. At that point, you can take a ladle of metal, pour it into what's called a shot sleeve. You push a button manually, that shot cylinder injects the hot metal into the mold. There is a timing mechanism, and the electronics in the machine, after a certain amount of seconds, which is called dwell time in die casting language, the machine will open automatically.
As it opens, when it's completely opened, the safety door is opened, the operator reaches in, takes out the casting and repeats the cycle.
(Tr. 13-14.)
 {¶ 52} 6. At the hearing, Mr. Lucak also described the operation of the plunger:
* * * It's the plunger on the end of the hydraulic shaft that drives the hot metal up into the mold, correct.
(Tr. 16.)
 {¶ 53} 7. At the hearing, Gary Curren testified as an expert witness on behalf of relator. Mr. Curren holds a bachelor degree with a major in mathematics and a minor in physics. He is a certified safety professional.
 {¶ 54} 8. On March 22, 2001, two days after the accident, Curren visited the foundry at relator's request. Curren examined the machine that had injured claimant.
 {¶ 55} 9. At the hearing, Curren testified:
[Relator's Counsel]: What safety devices are on that machine to protect a worker from accidental contact with the point of impact?
[Curren]: It actually had a two-stage type safety device. It had a gate guard or barrier guard, and coupled with that was an interlock system, which is an electrical device that disengages power or energy to the machine, unless the criteria is met, meaning that the gate guard is in the closed position.
[Relator's Counsel]: Okay. And based on your experience, is that sufficient guarding for such a machine?
[Curren]: Well, when you look at the Ohio Administrative Code and the specific standards covering die cast machines, they're found specifically in 4121:1-5-11, and in there it says die cast machines, the danger zone shall be guarded.
Yes, it did more than meet the criteria with the interlock and the barrier gate guard.
[Relator's Counsel]: There's been some testimony regarding photograph No. 14 of the machine. And Mr. Lumaban testified that he stuck his glove into the switch, which is photographed in No. 14. Is that the interlock device you were referring to?
[Curren]: Yes, it looks like a cam action with a roller on it, with a conduit with wires going into it.
Yes, I would say it is, yes.
[Relator's Counsel]: It was Mr. Lucak's testimony that by sticking your glove in that limiting switch the machine actually believes that the door has been shut?
[Curren]: That would be one way to fool it, yes.
* * *
[Relator's Counsel]: Let me draw your attention to Section 4121:1-5-11(d)6. I believe that's the section that applies to die cast machines?
[Curren]: Specifically, yes.
[Relator's Counsel]: And do you have an opinion as to whether or not this machine met that safety requirement?
[Curren]: Yes, it definitely met this requirement.
[Relator's Counsel]: How is it that it met this requirement?
[Curren]: The standard, specifically, says the danger zone of a die casting machine shall be guarded, and it was guarded via a barrier or gate guard, and also in addition with an interlocking system on the gate guard.
(Tr. 65-67.)
 {¶ 56} 10. Claimant also testified at the hearing. His testimony required an interpreter. Claimant was questioned at some length by counsel and the hearing officer regarding the plunger retraction procedure. At some point, based upon claimant's answers to the inquiries, the hearing officer was able to succinctly phrase the following question and to obtain the following answers from claimant:
HEARING OFFICER: In order to get the plunger to retract, you put this golf club tool in there, bracing it against one die half, and the other into this hole where the plunger is stuck, you then start jogging the one die half and then it forces it to free?
[Claimant]: Yes.
* * *
HEARING OFFICER: When you say you use this bypass switch, you did that so that you could move this die?
[Claimant]: Yes.
* * *
HEARING OFFICER: In order to use this golf club tool to free the stuck plunger, is it necessary to move this die, cause it to close somewhere, either side, but it's in order to perform what you're stating that you have to move this die —
[Claimant]: Yes.
HEARING OFFICER: — closed in this fashion?
[Claimant's Counsel]: That's why you hit the bypass button?
[Claimant]: Yes.
* * *
HEARING OFFICER: Right, but why is he using a bypass button? What is the purpose of that?
INTERPRETER: What's the purpose?
[Claimant's Counsel]: Why did he use the bypass button?
[Interpreter]: To move the die.
[Claimant's Counsel]: To move the die.
(Tr. 32-34.)
 {¶ 57} 11. During claimant's cross-examination by relator's counsel, the following exchange occurred:
[Relator's Counsel]: Now, on the night of your accident, Mr. Lumaban, the golf club was at machine No. 9?
[Claimant]: Yes, sir.
[Relator's Counsel]: And machine No. 9 is about 50 feet away from where you were?
[Claimant]: Yes, sir.
[Relator's Counsel]: And you chose not to go get the golf club because it was 50 feet away?
[Interpreter]: Instead of getting it back, if he gets it back the person who borrowed the golf club they might borrow it again. Instead, he chose to take that metal and use that.
[Relator's Counsel]: But that was your choice, wasn't it, Mr. Lumaban?
[Claimant]: Yeah.
[Relator's Counsel]: And you stuck your glove in the switch, didn't you?
[Claimant]: Yes, sir.
[Relator's Counsel]: And you stuck your glove in the switch so the switch wouldn't work, isn't that correct?
[Claimant]: To turn on the switch.
[Relator's Counsel]: You stuck your glove in the switch, didn't you?
[Claimant]: Yes.
(Tr. 39-40.)
 {¶ 58} 12. After cross-examination by relator's counsel, the following exchange occurred on re-direct examination:
[Claimant's Counsel]: Why did you put your glove there?
[Claimant]: To able to retract the die. To move you had to press the other switch.
[Claimant's Counsel]: You had to put the glove here, operate a switch, and the plunger would move?
[Claimant]: Right.
[Claimant's Counsel]: The die would move?
[Claimant]: Yeah, able to move, yeah.
* * *
[Claimant's Counsel]: If you put your glove in there, does it stop the door from closing?
[Claimant]: If you put the glove in here, you're able to move the die. We use the other switch to move the die when you do this.
[Claimant's Counsel]: One more time. This is the door to the die?
[Claimant]: Yes, ma'am.
[Claimant's Counsel]: Right. There's a switch, there's also this area. If you put the glove in here, you hit the switch, then the die will move?
[Claimant]: Yeah.
[Claimant's Counsel]: If you don't put your glove in here and you hit the switch, what would happen?
[Claimant]: Nothing.
(Tr. 41-43.)
 {¶ 59} 13. On re-cross examination by relator's counsel, the following exchange occurred:
[Relator's Counsel]: Mr. Lumaban, in other words, that switch there it's called a limit switch, that switch is there to protect workers from accidental contact with moving dies, isn't this right?
[Claimant]: Yeah.
[Relator's Counsel]: You stuck your glove to eliminate that safety device?
[Claimant]: Yeah. Yes, sir.
[Relator's Counsel]: That's all the questions I have for Mr. Lumaban.
(Tr. 43.)
 {¶ 60} 14. Following the March 19, 2003 hearing, the SHO issued an order granting the VSSR application. The SHO's order states:
The Staff Hearing Officer finds that O.A.C. 4121:1-5-11(D)(6)is applicable to the machine and situation in question. This Code section refers to "Die casting machines" and specifically states "(d)anger zones on die casting machines shall be guarded." O.A.C. 4121:1-5-01(B)(34) defines a "danger zone" as "the point of operation where a known hazard exists." O.A.C. 4121:1-5-01(B)(70) defines "guarded" as "covered, fenced, railed, enclosed, or otherwise shielded from accident contact." Webster's Dictionary defines "shield" as "a guard or safety screen, as over the moving parts of machinery". O.A.C. 4121:1-5-01(B)(97) defines "point of operation" as "the area where material is actually positioned and work is being performed during any process."
In the present case, claimant sustained a severe injury to his left upper extremity (crush and amputation injury to left forearm and hand) when his left arm was caught between two closing die halves. Claimant was attempting to dislodge an injection plunger that had become stuck while forcing molten metal into the closed die halves. While not a frequent occurrence, testimony at hearing indicated that the plunger stuck frequently enough to lead the employer to devise a tool called the "golf club" for use in freeing the plunger[.] * * * The die-casting machine would not be capable of delivering an injection of molten metal into the closed dies until and unless the injection plunger had retracted.
The claimant contends that the die casting machine was inadequately guarded, in violation of O.A.C. 4121-1-5-11(D)(6), in that the die halves should not have been able to close on his arm while he was attempting to free the stuck injection plunger. The employer counters that the zone of danger, being the area in which the die halves came together, was adequately and appropriately guarded by way of a safety door and dual operating buttons which together would prevent claimant's hands from entering the `danger zone' during the machine's casting cycle. Employer further asserts that the "golf club" tool and instruction in its use are additional methods by which the `danger zone' was guarded from accidental contact.
Testimony from claimant showed that, after realizing that the injection plunger was stuck, claimant attempted to free or dislodge it by placing a short metal bar against one die half and, while slowly causing the dies to close, guided the other end of the metal bar so that it would be in alignment with the end of the stuck injection plunger[.] * * * As the dies continued to close, claimant attempted to use the force of closure on the metal bar to drive the plunger backwards into its cavity and thereby cause it to retract into its proper position. Tragically, the dies closed onto claimant's left arm and caused the resulting injury.
When asked why he did not follow the employer's procedure for freeing a stuck plunger (i.e., use of the "golf club" tool (BWC investigation photo no. 11) and obtain the assistance of a co-worker), claimant stated that a "golf club" tool was not available for his machine and that no co-worker was available to assist him[.] * * * The employer countered that there were one or more "golf club" tools available for use with the casting machines, that claimant had been instructed to use the "golf club" tool to free stuck plungers and that claimant had also been told to obtain the assistance of a coworker in such a situation and not to attempt to free the plunger by himself[.] * * *
Testimony at hearing revealed that the die casting machine in question (number 8 machine) was equipped with several safety mechanisms at the time of claimant's injury[.] * * * Between the operator's position adjacent to the machine and the `danger zone', wherein the die halves were located and would close together, there was a sliding steel door. This door was equipped with a switch that would prevent movement of the die halves unless the safety door was closed[.] * * * The machine was also equipped with dual palm buttons, both of which had to be pressed in order to initiate the machine's casting cycle. The Staff Hearing Officer finds that, during the casting cycle of the machine, the `danger zone' (i.e., die location and area of movement) was adequately and properly guarded so as to prevent accidental contact with the dies while a casting was being made. The testimony of Mr. Curren was found persuasive on this point.
Contrary to the employer's contention, however, the inquiry does not stop with a review of only the casting operation (State, ex rel. Scott Fetzer Company, HalexDivision v. Industrial Commission of Ohio (1998),81 Ohio St.3d 462 * * *). Testimony from the parties confirmed that freeing the injection plunger when it would stick was also part of the operation of the machine and was one of claimant's responsibilities. Because the plungers of the various diecasting machines stuck frequently enough to warrant the fabrication of "golf club" tools, the Staff Hearing Officer finds that this process (freeing a stuck plunger) must be considered as an integral part of the machines' usual mode of operation. The metal door with an interlock switch and the dual palm buttons would not be useful in safeguarding the process of freeing a stuck injection plunger. Therefore, the fact that claimant wedged his glove into a metal door's interlock switch mechanism, to override its function of preventing access to the dies, would not be dispositive. Access to the dies was required in order to free a stuck plunger.
The critical question is the effect of claimant's purposeful, albeit negligent, placement of his left arm in the `danger zone' (between the die halves), during his attempt to free the stuck plunger, on the employer's duty to guard the machine against "accidental" contact with the dies. The employer contends that claimant's failure to obtain the assistance of a co-worker and failure to use the "golf club" tool in order to free the plunger constitutes unilateral negligence as would bar a finding that the employer violated a specific safety requirement. Claimant asserts that the simple fact that he was injured by the dies is proof that they were not guarded in a proper or effective manner.
One of the employer's defenses to claimant's assertions is the argument that, because no injury had ever before occurred during the operation of the die-casting machine in the manner in which claimant Lumaban was injured, his injury was the result of a first-time failure of a safety device and that the employer, consequently, is `immune' from liability in this instance. The Staff Hearing Officer finds that there has been no evidence presented to show that claimant's injuries were the result of a first-time malfunction of an otherwise appropriate and effective safety device on the die cast machine. The `immunity' afforded an employer in such a circumstance, pursuant to State, ex rel.M.T.D. Products, Inc. v. Stebbins (1975),43 Ohio St.2d 114 * * * is not applicable to the present case.
The employer suggests that claimant's injures resulted from his unilateral negligence on the date of injury. The Staff Hearing Officer notes that the issue of unilateral negligence does not properly arise unless it is shown that the employer was, initially, in compliance with applicable safety requirements. The purpose of the specific safety requirements is to prevent injury to workers and to protect them from their own acts of negligence, stupidity and folly. The question of unilateral negligence arises only where it can be shown that the worker unilaterally acted to disable, avoid or otherwise circumvent a proper safety device. The question in the instant claim becomes, therefore, one of whether or not the `danger zone' on the die casting machine was properly guarded and whether the employer's provision of the "golf club" tool qualifies as a proper means of `guarding' the danger zones of the die-casting machine during procedures to free a stuck plunger. If so, then claimant's unilateral act of purposefully avoiding or failing to use the "golf club" tool was the reason that his left arm was able to enter the `danger zone' of the machine and was also the reason for his subsequent injury.
The Staff Hearing Officer finds that the "danger zone" of the die-casting machine in question was not properly guarded and that the employer, therefore, violated the mandate of O.A.C. 4121[:]1-5-11(D)(6). This violation of a specific safety requirement was the direct and proximate cause of claimant's injury. As previously stated, "guarded" requires a manner of shielding or prevention against accidental contact with the "danger zone" (i.e., dies). "Accidental contact" must be construed as meaning the contact which results or has the potential to result in injury. As such, the danger zone herein should have been guarded so as to prevent the dies from closing onto, and thereby injuring, claimant. There is no evidence that establishes that it was necessary to completely close the dies in order to free a stuck plunger. The fact that the dies did so close, sufficient to crush claimant's arm, is proof that "accidental contact" was not effectively guarded against. Claimant's failure to use a "golf club" tool is not a bar, as the "danger zone" has been found to have been inadequately guarded. Claimant's negligence, stupidity or folly is what the required safety mechanisms were to guard against. Additionally, the Staff Hearing Officer does not find that the applicable Code section permits the employer to substitute a tool of some sort for the guarding specified therein (O.A.C. 4121:1-5-11(D)(6)). The Staff Hearing Officer finds that the rationale of State, ex rel.Scott Fetzer Company, Hallex [sic] Division v.Industrial Commission of Ohio (1998), 81 Ohio St.3d 462 * * * is applicable in that it was held that the use of a mechanism (there, a robotic device — here, a "golf club" tool) did not eliminate the need for guarding of the "danger zone" of the die casting machine against "accidental contact".
It is therefore ordered that an additional award of compensation be granted to the injured worker in the amount of twenty five percent (25%) of the maximum weekly rate under the rule of STATE EX REL ENGLE V. INDUSTRIALCOMMISSION, 142 Ohio St. 425.
(Emphasis sic.)
 {¶ 61} 15. Relator moved for rehearing pursuant to Ohio Adm. Code 4121-3-20(G). On October 4, 2003, another SHO mailed an order denying rehearing.
 {¶ 62} 16. On October 30, 2003, relator, Cast Specialties, Inc., filed this mandamus action.
Conclusions of Law:
 {¶ 63} Three issues are presented: (1) whether the commission abused its discretion by failing to find "unilateral negligence" which is a complete bar to a VSSR claim; (2) whether claimant's alleged intentional placement of his arm into the danger zone bars a finding that relator failed to guard the danger zone fromaccidental contact; and (3) whether relator is entitled to immunity under State ex rel. M.T.D. Products v. Stebbins
(1975), 43 Ohio St.2d 114, for an alleged first-time failure of a safety device that caused claimant's injury.
 {¶ 64} The magistrate finds: (1) the commission did not abuse its discretion by failing to find "unilateral negligence"; (2) any intentional placement of claimant's arm into the danger zone did not bar a commission finding that relator failed to guard the danger zone from accidental contact; and (3) relator is not entitled to immunity under M.T.D. Products.
 {¶ 65} Accordingly, it is the magistrate's decision that this court deny relator's request for a writ of mandamus, as more fully explained below.
 {¶ 66} Former Ohio Adm. Code 4121:1-5 sets forth specific safety requirements for workshops and factories.[3] Former Ohio Adm. Code 4121:1-5-11 is captioned "Forging machines, other power machines and machine tools, hydraulic and pneumatic presses, and power press brakes." Former Ohio Adm. Code4121:1-5-11(D) is captioned "Other power machines and machine tools." Former Ohio Adm. Code 4121:1-5-11(D)(6) is captioned "Die casting machines," and provides the following specific safety requirement:
"Danger zones on die casting machines shall be guarded."
 {¶ 67} Former Ohio Adm. Code 4121:1-5-01(B) provides two definitions pertinent to former Ohio Adm. Code 4121:1-5-11(D)(6)'s guarding requirement.
 {¶ 68} Former Ohio Adm. Code 4121:1-5-01(B)(34) states:
"Danger zone": the point of operation where a known hazard exists.
 {¶ 69} Former Ohio Adm. Code 4121:1-5-01(B)(70) states:
"Guarded": means that the object is covered, fenced, railed, enclosed, or otherwise shielded from accidental contact.
 {¶ 70} The first issue involves a concept known as "unilateral negligence," a defense to VSSR liability that has been described as applying "`only where the claimantdeliberately renders an otherwise complying device noncompliant [sic, nonconforming].' (Emphasis added.)" State ex rel.Quality Tower Serv., Inc. v. Indus. Comm. (2000),88 Ohio St.3d 190, 192, citing State ex rel. R.E.H. Co. v. Indus. Comm.
(1997), 79 Ohio St.3d 352, 355.
 {¶ 71} Unilateral negligence derives from State ex rel.Frank Brown Sons, Inc. v. Indus. Comm. (1988),37 Ohio St.3d 162, in which an employer avoided VSSR liability because an employee had removed a part of a scaffold that had been required by a specific safety requirement. Brown held that: (1) employers can be subject to VSSR penalties for "only those acts within the employer's control," and (2) a specific safety requirement does not impose a duty of "constant surveillance" just by requiring a securely and rigidly based scaffold. Id. at 164.
 {¶ 72} The "unilateral negligence" defense is not actually about an employee's negligence. Quality Tower, at 193. The employer instead avoids VSSR liability when the employee unilaterally violates a safety requirement, that is, when the employee removes or ignores equipment or instruction that complies with a specific safety requirement. Id. On the other hand, an employee's negligence in failing to protect himself from injury due to an employer's VSSR will never bar recovery because specific safety requirements exist to promote a safe work environment and to protect employees against their own negligence and folly. Id. Thus, the critical issue in a VSSR claim is always whether the employer complied with the specific safety requirement. Id.
 {¶ 73} Relator captions the issue here:
The industrial commission's order is an abuse of discretion in that it ignores the respondent Mr. Lumaban's own testimony that he stuck his glove in a switch to defeat a safety device that would have complied with the Ohio Administrative Code.
(Relator's brief at 4; emphasis omitted.)
 {¶ 74} Analysis begins here with the observation that, contrary to relator's above-quoted assertion, the commission clearly did not "ignore" claimant's testimony regarding the placement of his glove to defeat a safety device. Again, the SHO's order of March 19, 2003, states:
Contrary to the employer's contention, however, the inquiry does not stop with a review of only the casting operation (State, ex rel. Scott Fetzer Company, HalexDivision v. Industrial Commission of Ohio (1998),81 Ohio St.3d 462 * * *). Testimony from the parties confirmed that freeing the injection plunger when it would stick was also part of the operation of the machine and was one of claimant's responsibilities. Because the plungers of the various diecasting machines stuck frequently enough to warrant the fabrication of "golf club" tools, the Staff Hearing Officer finds that this process (freeing a stuck plunger) must be considered as an integral part of the machines' usual mode of operation. The metal door with an interlock switch and the dual palm buttons would not be useful in safeguarding the process of freeing a stuck injection plunger. Therefore, the fact that claimant wedged hisglove into a metal door's interlock switch mechanism, to overrideits function of preventing access to the dies, would not bedispositive. Access to the dies was required in order to free a stuck plunger.
(Emphasis added.)
 {¶ 75} Seemingly unaware of the above-quoted paragraph of the SHO's order, relator further asserts in this action:
Not only did the Staff Hearing Officer not make any mention of the Claimant's unilateral actions in defeating this safety device; incredibly, despite having just heard Ms. Lumaban himself admit that he stuck his glove in there, this Hearing Officer was not prepared to accept the employer's allegations that he did so. Quoting from the transcript of the hearing:
"Q: And I'm assuming by putting a glove in there, if that's infact what Mr. Lumaban did, as far as the machine's circuitry would be concerned, would believe it to think that the door was closed?" (Stip., P. 93.)
In other words, as far as the Industrial Commission's Hearing Officer is concerned, the Employer's claim that Lumaban stuck his glove in the safety device to defeat it, was not necessarily a fact even though Mr. Lumaban admitted it.
(Relator's brief at 6; emphasis sic.)
 {¶ 76} Criticism of the SHO for his statement during the hearing is clearly unwarranted. A thorough reading of claimant's testimony shows that his testimony, which required an interpreter, was often difficult to understand. Only after repeated questions from counsel and the hearing officer did a clear picture of his testimony emerge.
 {¶ 77} In short, relator's assertion here that the SHO refused to accept claimant's testimony that he used his glove to defeat a safety device lacks merit.
 {¶ 78} Relator goes on to argue:
In the case at bar, this machine unquestionably had an interlock device that prevented the dies from closing without the door first shutting to prevent accidental contact. Here, that device was defeated by Mr. Lumaban sticking his glove in the interlock device thereby fooling the machine to think that the door was closed. The above cited case law clearly establishes that an employer does not have a duty of constant surveillance to prevent employees from taking such unilaterally negligent actions that defeat safety devices that otherwise place the machine in compliance with the safety code nor does it require employers to be responsible for a penalty for acts beyond the employer's control. In this case, the employee has been rewarded financially for taking a unilateral action that defeated a safety device on the machine and caused his injury. * * *
(Relator's brief at 7.)
 {¶ 79} Relator's argument fails to comprehend why claimant "wedged his glove into a metal door's interlock switch mechanism, to override its function of preventing access to the dies." (To use the words contained in the SHO's order.) Claimant wedged his glove because it was necessary to defeat the safety device in order to gain access to the dies to free the stuck plunger.
 {¶ 80} As the SHO found, the danger zone was adequately guarded during the casting cycle. However, claimant was not injured during the casting cycle. He was injured during the plunger retraction procedure. During the plunger retraction procedure, the metal door with an interlock switch and the dual palm buttons were not useful in safeguarding the danger zone. In fact, the interlock switch had to be defeated in order to perform the plunger retraction procedure. Clearly, this scenario does not present a case for "unilateral negligence" that would exonerate relator from a VSSR claim.
 {¶ 81} Relator seems to argue that it met the guarding requirement by providing the golf club tool for claimant's use during the plunger retraction procedure. (Relator's brief at 8.) According to relator:
* * * The safety investigator measured the length of the shaft to be 39½ inches which, of course, is plenty long enough to enable the employee to keep his hands out of the danger zone. * * *
Id.
 {¶ 82} The SHO found the employer's providing of the golf club tool did not meet the guarding requirement. The SHO explained:
The Staff Hearing Officer finds that the "danger zone" of the die-casting machine in question was not properly guarded and that the employer, therefore, violated the mandate of O.A.C. 4121[:]1-5-11(D)(6). This violation of a specific safety requirement was the direct and proximate cause of claimant's injury. As previously stated, "guarded" requires a manner of shielding or prevention against accidental contact with the "danger zone" (i.e., dies). "Accidental contact" must be construed as meaning the contact which results or has the potential to result in injury. As such, the danger zone herein should have been guarded so as to prevent the dies from closing onto, and thereby injuring, claimant. There is no evidence that establishes that it was necessary to completely close the dies in order to free a stuck plunger. The fact that the dies did so close, sufficient to crush claimant's arm, is proof that "accidental contact" was not effectively guarded against. Claimant's failure to use a "golf club" tool is not a bar, as the "danger zone" has been found to have been inadequately guarded. Claimant's negligence, stupidity or folly is what the required safety mechanisms were to guard against. Additionally, the Staff Hearing Officer does not find that the applicable Code section permits the employer to substitute a tool of some sort for the guarding specified therein (O.A.C. 4121:1-5-11(D)(6)). The Staff Hearing Officer finds that the rationale of State, ex rel.Scott Fetzer Company, Hallex [sic] Division v.Industrial Commission of Ohio (1998), 81 Ohio St.3d 462 * * * is applicable in that it was held that the use of a mechanism (there, a robotic device — here, a "golf club" tool) did not eliminate the need for guarding of the "danger zone" of the die casting machine against "accidental contact".
 {¶ 83} Here, relator seems to suggest that claimant's failure to use the golf club tool during the plunger retraction procedure amounts to unilateral negligence that defeats his VSSR claim. Relator's suggestion is incorrect.
 {¶ 84} Even if it can be said that claimant was negligent when he failed to use the golf club tool, such negligence or folly cannot exonerate relator if providing the golf club tool does not meet the guarding requirement. The SHO applied State exrel. Scott Fetzer Co., Halex Div. v. Indus. Comm. (1998),81 Ohio St.3d 462, to support his determination that the employer's providing of the golf club tool does not meet the guarding requirement. Here, relator does not argue that the Scott Fetzer
case fails to support this determination. Instead, relator suggests that any negligence on claimant's part in failing to use the golf club tool exonerates relator in any event. Relator's argument simply miscomprehends the concept of unilateral negligence.
 {¶ 85} The second issue is whether claimant's intentional placement of his arm into the danger zone bars a finding that relator failed to guard the danger zone from accidental contact.
 {¶ 86} Relator points out that, because a VSSR award is deemed a penalty against an employer, a specific safety requirement must be strictly construed against the applicability to the employer. State ex rel. Burton v. Indus. Comm. (1989),46 Ohio St.3d 170; State ex rel. Watson v. Indus. Comm. (1986),29 Ohio App.3d 354. Relator also points out that a specific safety requirement must plainly apprise an employer of its legal duty towards its employees. State ex rel. Trydle v. Indus.Comm. (1972), 32 Ohio St.2d 257.
 {¶ 87} According to relator, claimant made a foolish yet intentional decision to place his arm into the danger zone. Because former Ohio Adm. Code 4121:1-5-11(D)(6) requires the employer to guard the danger zone against accidental contact, relator argues that the rule of strict construction prevents a finding of a violation where the claimant intentionally, rather than accidentally, places a body part into the danger zone, and an injury results. The magistrate disagrees.
 {¶ 88} The second issue is answered by State ex rel.Cincinnati Drum Service, Inc. v. Indus. Comm. (1990),52 Ohio St.3d 135, a case involving the application of the same definition of "guarded" at issue here.
 {¶ 89} In Cincinnati Drum, Larry Allen ("Allen") was the operator of a "wheelabrator sandblasting machine" that cleaned steel drums. The machine had belts and pulleys that were not guarded on the left side. Allen was responsible for removing the drums from the machine after sandblasting. Occasionally, a drum would jam in the doorway of the machine. If the machine became jammed, electrical power which drives the belts and pulleys automatically shuts off. Even though the power shuts off, the belts continue to move of their own momentum for approximately one and one-half minutes, during which time the machine continues to operate. Because the machine operator runs the risk of being hit in the face with steel pellets, the door of the machine cannot be opened until the belts are at a standstill.
 {¶ 90} On the date of injury, a drum jammed in the machine, and Allen intentionally placed his hand on a belt to stop its momentum to enable him to open the door and free the drum. Allen was injured when the belt drew his hand into a pulley.
 {¶ 91} Allen's VSSR application was granted by the commission. The commission found that the employer had violated former Ohio Adm. Code 4121:1-5-04(C)(3) which requires that "Vee belts and their pulleys, where exposed to contact, shall be guarded." Former Ohio Adm. Code 4121:1-5-01(B)(70)'s definition of "guarded" applied to the specific safety rule in the CincinnatiDrum case as it does in the instant case.
 {¶ 92} In Cincinnati Drum, the employer argued that because Allen's act of touching the vee belts was "intentional," it could not, by definition, be "accidental" within the meaning of the safety regulation. The court, in a four-to-three decision, disagreed.
 {¶ 93} In Cincinnati Drum, the employer also argued that the proximate cause of the injury was Allen intentionally placing his hand on the belt. The court majority again disagreed, explaining:
Although Allen's contact with the belt was intentional, he did not intend to be injured as a result of the contact. If we would accept appellant's argument, we would come to an unjust and illogical conclusion that Allen, while performing his regular assigned duties, did not accidentally injure himself but, in fact, intended to cause injury to his person.
Id. at 138.
 {¶ 94} Cincinnati Drum is dispositive of the second issue here. Based on that decision, it is clear that, even if it can be said that claimant intentionally placed his arm into the danger zone, relator can be found to have violated the guarding requirement.
 {¶ 95} The third issue is whether the commission abused its discretion in failing to find immunity for relator because of an alleged first-time failure of a safety device.
 {¶ 96} The third issue is premised upon M.T.D. Products,
supra, wherein the court states:
* * * The fact that a safety device that otherwise complies with the safety regulations failed on a single occasion is not alone sufficient to find that the safety regulation was violated. * * *
Id. at 118.
 {¶ 97} In the SHO's order of March 19, 2003, this issue was addressed as follows:
One of the employer's defenses to claimant's assertions is the argument that, because no injury had ever before occurred during the operation of the die-casting machine in the manner in which claimant Lumaban was injured, his injury was the result of a first-time failure of a safety device and that the employer, consequently, is `immune' from liability in this instance. The Staff Hearing Officer finds that there has been no evidence presented to show that claimant's injuries were the result of a first-time malfunction of an otherwise appropriate and effective safety device on the die cast machine. The `immunity' afforded an employer in such a circumstance, pursuant to State, ex rel.M.T.D. Products, Inc. v. Stebbins (1975),43 Ohio St.2d 114 * * * is not applicable to the present case.
 {¶ 98} The SHO correctly refused to apply the principal ofM.T.D. Products to give immunity to relator for an alleged "first-time malfunction of an otherwise appropriate and effective safety device on the die cast machine." As the SHO found, there was no safety device on the machine to guard the danger zone during the plunger retraction procedure. The SHO explained that "[t]here is no evidence that establishes that it was necessary tocompletely close the dies in order to free a stuck plunger." (Emphasis added.) On the machine, there was no safety device designed to prevent the dies from completely closing during the plunger retraction procedure. If there was no such safety device in existence, then, obviously, there cannot be a "first-time malfunction" of a nonexistent safety device. In short, relator's immunity claim under M.T.D. Products lacks merit. See State exrel. Pressware Internatl., Inc. v. Indus. Comm. (1999),85 Ohio St.3d 284, 290 (court refers to "immunity under M.T.D.").
 {¶ 99} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
[1] The parties have submitted a Joint Stipulation of Evidence, cited hereafter as "Stip. Evid."
[2] Ohio Adm. Code 4121:1-5-11 and 4121:1-5-01 are now codified at 4123:1-5-11 and 4123:1-5-01.
[3] Effective November 1, 2003, the Ohio General Assembly renumbered these specific safety requirements so that they are now designated as Ohio Adm. Code 4123:1-5.